

**NUMBER 13-14-00427-CR**

**COURT OF APPEALS**

**THIRTEENTH DISTRICT OF TEXAS**

**CORPUS CHRISTI – EDINBURG**

---

**MIGUEL ANGEL ORTIZ, JR.,**                          **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                **Appellee.**

---

**On appeal from the 389th District Court
of Hidalgo County, Texas.**

---

**MEMORANDUM OPINION**

**Before Justices Rodriguez, Garza and Longoria
Memorandum Opinion by Justice Longoria**

A jury found appellant, Miguel Angel Ortiz, guilty of the offenses of unlawful possession of a firearm (Count 1), and unlawful possession of metal or body armor by a felon (Count 2). *See* TEX. PENAL CODE ANN. §§ 46.041, 46.04(a) (West, Westlaw through

Chapter 46 2015 R.S.).  Ortiz now challenges his conviction based on the alleged legal and factual insufficiency of evidence.  We affirm.

## I. BACKGROUND

In the early-morning hours of July 3, 2013, Pharr police responded to a 911 call regarding a family disturbance.  According to testimony from Ortiz's brother, Fernando Perez, Ortiz arrived at his mother's house between 11:00 p.m. and 12:00 a.m.  Ortiz lived with their aunt, but occasionally spent the night at his mother's house.  Ortiz kept clothes in a bedroom located near the entrance of the home (the "entrance bedroom").  Perez heard noises and banging between 3:00 a.m. and 4:00 a.m.  The noises awoke Ortiz's mother and brothers.  Perez looked through a window into the bathroom and saw Ortiz panicking and appearing to experience a hallucination.  According to Perez, Ortiz began to shout that Jesus was coming and the world was ending.  Perez testified that he thought Ortiz was under the influence of drugs.  The family's efforts to calm Ortiz did not work.

According to Perez, the body armor at issue in Count 2 was located on the floor of the entrance bedroom prior to Ortiz's arrival.  After the episode began, Ortiz brought the armor to his mother and brother, who helped him put on the armor.  Perez said that Ortiz wore the body armor for only a few moments.  The family hoped that wearing the armor would "relax" Ortiz.

The gun at issue in Count 1 was an assault rifle also located on the entrance bedroom floor before Ortiz arrived.  However, Perez testified that Ortiz never touched the gun during the episode, and Perez put the gun in their mother's car when Ortiz began to panic.  At trial, Perez said the gun and the armor both belonged to Carlos Ortiz, Ortiz's older brother.

2

Around 4:00 a.m., Ortiz's youngest brother, Javier Perez, called the police. Perez testified that Javier called the police because the family could not control the situation and Javier worried his mother would be kept awake by all the commotion. During the call, Javier asked for a patrol unit because his brother was "freaking out" and possibly under the influence of drugs. Javier informed the 911 dispatcher that the family tried to control Ortiz and Ortiz pushed his mom out of the way.

Javier told the dispatcher that Ortiz was wearing a bulletproof vest, and the dispatcher asked Javier if Ortiz had any guns on him. Javier described how Ortiz did not have a gun on his person but the family did not know if Ortiz kept any guns in the house. Javier said Ortiz had no registered firearms but Ortiz could have a gun in his truck. Javier again confirmed Ortiz wore a bulletproof vest. Javier told the dispatcher that Ortiz shoved his mother out of the way but without any intention of hurting her. The following exchange occurred toward the end of the 911 call:

Javier:      This is very important; he has an AK-47 on him.

Dispatcher:  He has an AK-47?

Javier:      Yes sir.

Dispatcher:  You are watching it right now? You are watching it right now sir?

Javier:      CALMATE, calmate, calmate, calmate![1]

Dispatcher:  Sir what is he doing now? Sir what is he doing now, tell me?

Javier:      Calmate!

Dispatcher:  Sir what is he doing now tell me?

---

[1] In English, "calmate" means "calm down".

3

Javier: I guess he just came to his senses and just calmed down and told me not to call you. Like I said, uh he doesn't have an AK-47, I had seen it before but my mom told him to get rid of it it's gone. She even confirmed it with him. [unintelligible] But like I said my brother said he just saw her.

Dispatcher: Okay but did you see the AK-47? Did you see it just now? Where did he put it, where did he put the gun?

Javier: He doesn't have it, I don't even know where it's at.

[mother speaking indistinctly, yelling in background[2]]

Dispatcher: Where is the gun right now sir, okay? Tell me, where is the gun right now?

Javier: I'm going to start looking—

Dispatcher: Okay just tell me where the gun is. Where is he at right now? Is he in the living room? Where is he at right now?

Javier: Now he is sitting down, talking to the police officer.

Dispatcher: He's talking to the cops?

Javier: Yes, thank you sir.

Dispatcher: Okay okay sir, thank you.

Following the 911 call, several police officers arrived at Ortiz's mother's house, including Officer Esteban Dimas. Dimas testified that he saw an "assault rifle" in the front passenger seat of a Chrysler Pacifica parked in the driveway of the house.

Officer Xavier Sanchez, another officer dispatched to the scene, testified that the 911 call was in reference to a male individual with a rifle and bulletproof vest. Upon entering the home, Sanchez noticed the body armor on the left side of the bed in the entrance bedroom. During cross-examination, Sanchez testified that he never saw Ortiz

---

[2] We omitted from the 911 call various background noises and any conversation where the dispatcher and Javier talked over one another. We reproduced verbatim any part of the conversation that is relevant and audible.

4

in the care, custody, control or management of any body armor or weapon. Sanchez further testified that the police did not find Ortiz's DNA or fingerprints on the weapon or the body armor.

Police Investigator Juan Gonzalez conducted the investigation of Ortiz's case. Gonzalez confirmed that Ortiz's mother owned the Chrysler Pacifica where police found the firearm. Gonzalez also testified that the McAllen Police Department reported the body armor as stolen but did not know the identity of the thief. Gonzalez further testified that he interviewed Ortiz on the morning of Ortiz's arrest. Gonzalez said that at one point during their videotaped interview, Ortiz corrected Gonzalez by saying that the firearm was an SKS, rather than an AK-47. Gonzalez read to the jury the exact words spoken during the interview, where Gonzalez said, "It's got to be somebody's. It's in the house, okay? Other things, the SKS. It's an SKS, I don't believe it's an AK-47." Ortiz responded, "It's an SKS."

The jury found Ortiz guilty, and assessed concurrent sentences of seven years' imprisonment for each charge and no fine. This appeal ensued.

## II. SUFFICIENCY OF THE EVIDENCE

By his first two issues, which we address as one, appellant challenges the sufficiency of the evidence supporting his conviction on both counts.

### A. Standard of Review

We review sufficiency challenges using the legal-sufficiency standard of review announced by the United States Supreme Court in *Jackson v. Virginia,* 443 U.S. 307, 319 (1979). *Brooks v. State,* 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). Under this standard of review, evidence sufficiently supports a conviction if a rational fact-finder

5

could find the prosecutor proved each essential element of the charged offense beyond a reasonable doubt. *Jackson,* 443 U.S. at 319; *Isassi v. State,* 330 S.W. 3d 633, 638 (Tex. Crim. App. 2010). In our review, we consider all the evidence in the light most favorable to the verdict. *Jackson,* 443 US. at 319. Evidence is insufficient under the *Jackson* standard when: (1) the record contains no evidence probative of an element of the offense; (2) the record contains a mere "modicum" of evidence probative of an element of the offense; (3) the evidence conclusively establishes a reasonable doubt on an element of the offense; or (4) the acts alleged do not constitute the criminal offense charged. *Jackson*, 443 U.S. at 314. The jury is the sole judge of the weight and credibility of the evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (West, Westlaw through Chapter 46 2015 R.S.); *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008). Thus, we may not substitute our judgment for the fact-finder's judgment when performing an evidentiary sufficiency review. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Instead, our task is to determine the reasonableness of necessary inferences based on the combined and cumulative force of the evidence viewed in the light most favorable to the verdict. *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007).

We presume the fact-finder resolved conflicting inferences in favor of the verdict and defer to the fact finder's resolution. *Jackson*, 443 U.S. at 326; *Isassi*, 330 S.W.3d at 638; *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991) (holding that in determining the sufficiency of the evidence and faced with a record containing conflicting inferences, the court must presume the trier of fact resolved any conflict in favor of the prosecution).

6

In evaluating sufficiency of the evidence, we must favorably consider all the evidence supporting the conviction. *See, e.g., Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We measure the sufficiency of the evidence by the elements of the offense as defined by the hypothetically correct jury charge for the case. *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "Such a charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villarreal v. State,* 286 S.W. 3d 321, 327 (Tex. Crim. App. 2009). The law as authorized by the indictment means the statutory elements of the charged offense as modified by the facts and legal theories described in the charging instrument. *See Curry v. State*, 30 S.W.3d 394, 404–05 (Tex. Crim. App. 2000). The State must prove the hypothetically-correct jury charge authorized by the indictment, and the indictment must authorize the hypothetically correct jury charge. *Gollihar v. State*, 46 S.W.3d 243, 256 n. 20 (Tex. Crim. App. 2002).

The indictment in this case alleges that Ortiz intentionally or knowingly possessed a firearm before the fifth anniversary of his release on a felony from prison. *See* TEX. PENAL CODE ANN. § 46.04(a). Additionally, the indictment alleges that Ortiz intentionally or knowingly possessed metal or body armor as a felon. *See id.* § 46.041 (West, Westlaw through Chapter 46 2015 R.S.).

**B. Applicable Law**

To establish unlawful possession of a firearm by a felon, the State must prove: (1) the defendant previously committed a felony; (2) the defendant unlawfully possessed a

firearm; (3) after the conviction and before the fifth anniversary of his release from confinement; and (4) at any location other than the person's home. *Id.* § 46.04(a). To establish unlawful possession of metal or body armor by a felon, the State must prove: (1) the defendant previously committed a felony and; (2) the defendant possessed metal or body armor after conviction. *Id.* §§ 46.041, 46.041(a).

"'Possession' means actual care, custody, control, or management of an item." *Id.* § 1.07(a)(39). A person commits a "possession offense" by voluntarily possessing a prohibited item. *See id.* § 6.01(a) ) (West, Westlaw through Chapter 46 2015 R.S.). In cases involving unlawful possession of a firearm by a felon, we analyze the sufficiency of the evidence under the same rules adopted for unlawful possession of a controlled substance. *Gill v. State*, 57 S.W.3d 540, 545 (Tex. App.—Waco 2001, no pet.) (discussing factors previously used to establish affirmative links in an illegal drug possession case and applying them to a situation involving unlawful possession of a firearm by a felon); *Young v. State*, 752 S.W.2d 137, 140 (Tex. App.—Dallas 1988, pet. ref'd). We also consider body armor as contraband for the purposes of analyzing the sufficiency of evidence. *See Hargrove v. State,* 211 S.W.3d 379, 385 (Tex. App.—San Antonio 2006, pet. ref'd) (performing the "affirmative links" analysis to possession of body armor). In order to show possession of a firearm or body armor, the State must establish that Ortiz consciously, intentionally, or knowingly exercised actual care, control, or custody of the contraband. *See Cude v. State*, 716 S.W.2d 46, 47 (Tex. Crim. App. 1986); *see also Nguyen v. State*, 54 S.W.3d 49, 52 (Tex. App.—Texarkana 2001, pet. ref'd). Thus, the State's evidence must establish that Ortiz's connection with the contraband was

more than just fortuitous. *See Brown v. State*, 911 S.W.2d 744, 747 (Tex. Crim. App. 1995).

If the police did not find the contraband on Ortiz's person or in Ortiz's exclusive possession, then the evidence must otherwise affirmatively link Ortiz to the contraband. *See Flores v. State,* 650 S.W.2d 429 (Tex. Crim. App. 1983); *Davis v. State*, 93 S.W.3d 664, 667 (Tex. App.—Texarkana 2002, pet. ref'd). We evaluate whether there are affirmative links by considering the totality of the circumstances. *Hyett v. State*, 58 S.W.3d 826, 830–31 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). Factors which may aid in establishing an affirmative link between a defendant and the contraband include whether: (1) the contraband was in plain view; (2) the accused was the owner of the place where the contraband was found; (3) the accused was in close proximity and had ready access to the contraband; (4) contraband was found on the accused; (5) the defendant attempted to flee; (6) the accused exhibited conduct indicating a consciousness of guilt, including extreme nervousness or furtive gestures; (7) the accused had a special connection or relationship to the contraband; (8) the place where the contraband was found was enclosed; (9) occupants of the place where the contraband was found gave conflicting statements about relevant matters; and (10) affirmative statements connect the accused to the contraband, including incriminating statements made by the accused at the time of the arrest. *Dixon v. State*, 918 S.W.2d 678, 681 (Tex. App.—Beaumont 1996, no pet.); *Watson v. State*, 861 S.W.2d 410, 414–15 (Tex. App.—Beaumont 1993, pet. ref'd). The number of factors present is less important than the degree to which the factors tend to affirmatively link the accused to the contraband. *See Wallace v. State*, 932 S.W.2d 519, 524 (Tex. App.—Tyler 1995, pet. ref'd).

### C. Analysis

#### a. Sufficiency of the Evidence to Support Possession of a Firearm

The police did not find the firearm on Ortiz's person or in Ortiz's exclusive possession. Therefore, the evidence must otherwise affirmatively link Ortiz to the firearm. *See Davis,* 93 S.W.3d at 667.

The firearm was in plain view in the entrance bedroom where Ortiz slept and kept belongings at his mother's house. *See Dixon*, 918 S.W.2d at 681. The jury could have relied on Perez's testimony that, prior to the police arriving at the house and seeing the gun in the car, the firearm was located in plain view on the floor of the entrance bedroom prior to Ortiz's arrival. *Id.* Since Ortiz kept clothes and personal belongings in the entrance bedroom, the jury could have rationally inferred that the firearm was originally in plain view in his bedroom. Additionally, Ortiz was in close proximity to the firearm and had ready access to the firearm. *Id.* Prior to Perez moving the firearm, the gun was located in the entrance bedroom where Ortiz slept. Ortiz also had a special connection or relationship to the firearm as shown by Javier's 911 call partially indicating that Ortiz possessed the gun. *Id.* Javier said that Ortiz had a gun "on him." Though Javier vacillated between saying that Ortiz had a gun and that Ortiz did not have a gun, Javier eventually made a firm and clear statement that Ortiz did have a gun. Javier responded, "Yes sir," when the dispatcher asked Javier to confirm that Ortiz had an AK-47. The jury was free to believe Javier's statements during the 911 call and disbelieve any contrary statements.

Furthermore, in the videotaped interview between Ortiz and the investigator, Ortiz corrected the investigator by saying that the model of the firearm was actually a SKS and

not an AK-47. Ortiz's statement indicates personal knowledge of the gun. Ortiz's correction also emphasizes how his possession of the gun was more than fortuitous since Ortiz was aware of the existence of the gun. *See Brown*, 911 S.W.2d at 747.

Moreover, Ortiz's brothers gave conflicting statements about whether Ortiz ever had the gun on his person. Originally, Javier said Ortiz had an AK-47 on his person. Javier later said that Ortiz never had a gun on him, but also said that Ortiz had owned a gun previously but their mother made Ortiz get rid of it. Perez, by contrast, consistently testified that Ortiz did not have any type of weapon at any point in time. Perez himself moved the SKS outside to the car. Regardless, there is conflicting evidence regarding Ortiz's possession of the gun that night. We must defer to the jury's resolution of the conflict between Javier's statements during the 911 call and Perez's statements during his testimony. *See Jackson,* 443 US. at 319

Considering all of the factors, we find that an affirmative link exists between Ortiz and the firearm. *See Dixon*, 918 S.W.2d at 681; *Watson*, 861 S.W.2d at 414–15. When considered in the light most favorable to the verdict, the record evidence would allow a rational trier of fact to find that Ortiz knowingly possessed the firearm. *See id.* Therefore, we conclude that the evidence supporting Ortiz's conviction for possession of a firearm by a felon is sufficient. *See Jackson*, 443 U.S. at 314.

### b. Sufficiency of the Evidence to Support Possession of Body Armor

Since Ortiz was not in the exclusive possession of the body armor, we must establish if the evidence was sufficient to establish an affirmative link between Ortiz and the body armor. *See Flores,* 650 S.W.2d at 429.

11

More than a scintilla of evidence indicates that Ortiz was in possession of the body armor. Officer Sanchez claimed the body armor was in plain view on the bed in the entrance bedroom of the house when the police arrived. *See Dixon*, 918 S.W.2d at 681. Since Ortiz slept in the entrance bedroom and kept clothes in the entrance bedroom, this weighs in favor of finding affirmative links between Ortiz and the armor. *See id.* Furthermore, Ortiz was in close proximity to the body armor and had ready access to the body armor. *See id.* The police found the body armor in the bedroom on the floor next to the bed where Ortiz slept. Ortiz had a special connection or relationship to the body armor because Ortiz brought the family the body armor during his episode. *See id.* The family put the armor on Ortiz to relax him, which the jury could infer meant that Ortiz was familiar with the body armor. The place where police found the body armor was an enclosed area that the family considered Ortiz's space at times when Ortiz stayed with his mother. *See id.* Affirmative statements in Javier's 911 call and Perez's statement connect Ortiz to the body armor. *See id.* Javier repeatedly told the dispatcher Ortiz was wearing a bulletproof vest. Perez also testified that the body armor was located in Ortiz's entrance bedroom on the floor.

The evidence in this case meets many of the factors for establishing an affirmative link between Ortiz and the body armor. *See id.* Considering all of the evidence favorably in light of the jury verdict, we find that an affirmative link exists between Ortiz and the body armor. *See Jackson,* 443 US. at 319. When considered in the light most favorable to the verdict, the evidence would allow a rational trier of fact to find that Ortiz knowingly possessed the body armor. *See id.*

12

### c. Summary

Having concluded that the evidence is sufficient to support Ortiz's convictions on both counts, we overrule Ortiz's sole issue.[3]

### IV. CONCLUSION

We affirm the judgment of the trial court.


NORA L. LONGORIA
Justice


Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
25th day of June, 2015.

---

[3] Ortiz waived his remaining issue, that the trial court abused its discretion by denying his motion for an instructed verdict, by failing to present any argument or authorities in his brief. *See* TEX. R. APP. P. 38.1(i); *see also Valadez v. Avitia,* 238 S.W.3d 843, 845 (Tex. App.—El Paso 2007, no pet.).

13